# UNITED STATES DISTRICT COURT FILED
## DISTRICT OF CONNECTICUT 2011 AUG -1  P 1: 00

US DISTRICT COURT
HARTFORD CT

Milna Rosario                                      ,

Plaintiff,

v.                                          Case No. 3:11CV1208 JCH

(To be supplied by the Court)

University of Connecticut Health Center       ,

Defendant(s).

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

1.    Plaintiff resides at the following location: 12 Marble Faun Lane, Windsor, CT  06095

_____

2.    Defendant(s) reside(s) at the following location [Attach additional sheets if more

space is required]: 263 Farmington Avenue, Farmington, CT  06034-4035

_____

_____

3.    This action is brought pursuant to [Check all spaces that apply to the type of

claim(s) you wish to assert against the Defendant(s)]:

☒    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et
seq., for employment discrimination on the basis of race, color, religion, sex, or
national origin.  Jurisdiction is specifically conferred on this Court by 42 U.S.C. §
2000e-5(f).  Equitable and other relief is sought under 42 U.S.C. § 2000e-5(g)
and the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

☐    Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621,
et seq., for employment discrimination based upon age.  Jurisdiction is alleged
pursuant to 28 U.S.C. §§ 1331, 1337, and/or 1343.  Equitable and other relief is
sought under 29 U.S.C. §§ 626(b) and (c) or  §§ 633a(b) and (c).

My Year of Birth is: _____.

☐     Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701, et seq., for employment discrimination on the basis of a disability against an employer which constitutes a program or activity receiving Federal financial assistance. Jurisdiction is asserted under 28 U.S.C. §§ 1331, 1337 and/or 1343. Equitable and other relief is sought under 29 U.S.C. § 794a.

☐     Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, et seq., for employment discrimination on the basis of a disability against a private employer. Jurisdiction is specifically conferred on this Court by 42 U.S.C.§ 2000e-5(f). See 42 U.S.C. § 12117(a). Equitable and other relief is sought pursuant to 42 U.S.C. § 2000e-5(g). Id.

4.     List **all** cases you have filed in this court in the last ten (10) years. Use additional

sheets if necessary:

_____

_____

_____

_____

_____

_____

_____

5.     The acts complained of in this suit concern [Check all spaces that are applicable

to your claim(s)]:

    (A)   ☐     Failure to hire me. I was refused a job on the following date(s): ____

                                                        _____.

    (B)   ☐     Termination of my employment. I was terminated from my

                  employment on the following date: _____.

    (C)   ☐     Failure to promote me. I was refused a promotion on the following

                  date(s): _____.

(D)  ☒  Other acts as specified below: Failure to enforce sexual harrassment

policy. _____

_____

_____

_____

6.     The conduct of the Defendant(s) was discriminatory because it was based upon:

race [☐ color [☐ religion [☐, sex [☒, age [☐, national origin [☐ or disability [☐. [Please

check all applicable bases for your claim of discrimination and explain further, if

necessary]: Violation of Title VII of the Civil Rights Act of 1964 _____

_____

7.     The facts surrounding my claim of employment discrimination are as follows

[Attach additional sheets, if necessary]:

On September 8, 2010, I was interviewed by Bob Camilleri, Complaint Investigator from the Office of

Diversity and Equity based on a sexual harassment complaint I filed against Greg Downey who is

one of my co-workers at the McDougall Correctional Institution.  An investigation was completed.  Greg

Downey was found guilty of violating Department of Correction Administrative Directive 2.2.  As of the

filing of this civil action, I am still working with Greg Downey. _____

_____

_____

8.     The approximate number of persons who are employed by the Defendant

employer I am suing is: 4325_____.

9.     The alleged discrimination occurred on or about the following date(s) or time

period: September 4, 2010 _____.

3

10. I filed charges with the:

☐ Equal Employment Opportunity Commission

☒ Connecticut Commission on Human Rights and Opportunities

11. The Equal Employment Opportunity Commission issued a Notice of Right to Sue letter **(copy attached)**, which I received on or about the following date: May 5, 2011 .
**[NOTE:** If you filed charges with the EEOC or the CHRO, you **MUST** attach a copy of the Notice of Right to Sue letter for this Court to consider your claim(s). Failure to do so may result in delaying consideration of your claim(s).]

12. The EEOC or the CHRO determined that there was no probable cause to believe that discrimination occurred. My reasons for questioning that determination are as follows [Attach additional sheets, if necessary]: _____

_____

_____

_____

13. If relief is not granted, I will be irreparably denied rights secured under the law(s) referred to in Item Number 3, above.

14. WHEREFORE, Plaintiff(s) pray(s) that: The Court grant such relief as may be deemed appropriate, including **[NOTE:** While all of the forms of relief listed below may not be available in a particular action, you should place a check next to each form of relief you seek.):

☒ Injunctive orders (specify the type of injunctive relief sought): _____
Termination or removal of Greg Downey from the McDougall Correctional Institution ;

☐ Backpay;

4

☐    Reinstatement to my former position;

☒    Monetary damages (specify the type(s) of monetary damages sought): __

as applicable by law for emotional distress _____ ;

☐    Other (specify the nature of any additional relief sought, not otherwise

         provided for on this form): _____

_____ ;

        AND costs and attorneys' fees.

## JURY DEMAND

    I hereby    DO ☒    DO NOT ☐ demand a trial by jury.

| | |
|---|---|
| Original signature of attorney (if any) | Plaintiff's Original Signature |
| | *Milna Rosario* |
| Printed Name and address | Printed Name and address |
| | *Milna Rosario* |
| | *12 marble turn Lane windsor, CT.* |
| | *06095* |
| ( ) | *860 285 - 8366* |
| Attorney's telephone | Plaintiff's telephone |
| | *milna @ sbc global.net* |
| Email address if available | Email address if available |

Dated: _____

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he/she is the plaintiff in the above action, that he/she has read the above complaint and that the information contained in the complaint is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed at _____  on _____ .
       (location)                       (date)

**Plaintiff's Original Signature**

(Rev. 9/24/08)

6



**State of Connecticut**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**
Capitol Region Office ~ 999 Asylum Avenue, 2nd Floor, Hartford, CT 06105
*Promoting Equality and Justice for all People*

# ORIGINAL

May 5, 2011

Milna Rosario
12 Marble Faun Lane
Windsor, CT 06095

### Re: Milna Rosario v. University of Connecticut Health Center
CHRO No. 1110189
EEOC No. 16A-2011-00227

Dear Ms. Rosario:

Pursuant to Public Act 98-245, enclosed herewith is Release of Jurisdiction on the above referenced case. It authorizes you to commence a civil action against the Respondent in Superior Court, in accordance with Section 46a-100 and Sections 46a-102 to 46a-104 of Connecticut General Statutes.

The Commission will take no further action in this matter.

Sincerely,

*Epifanio Carrasquillo*

Epifanio Carrasquillo
Regional Manager

Ec/dam

Enclosure

Cc:  Karen Duffy Wallace, Esq.                    Donald R. Green, Esq.
     University of Connecticut Health Center      University of Connecticut Health Center
     16 Munson Road                               263 Farmington Avenue
     P.O. Box 4035                                Farmington, CT 06030-3800
     Farmington, CT 06034

 University of Connecticut Health Center

Office of Diversity and Equity

To: Milna Rosario (Complainant)
Clinical Social Worker, CMHC-MacDougall

Gregory Downey (Respondent)
Licensed Professional Counselor-Correctional, CMHC-MacDougall

Dr. Robert Trestman
Executive Director, CMHC

Karen Duffy Wallace
Director, Labor Relations and Employment Services

Rikel Lightner
Administrator 2, CMHC

Attorney Andrew Houlding
One State Street
Hartford, CT 06103

From: Robert Camilleri
EEO Specialist, Office of Diversity and Equity

Cc: Dana McGee
Associate Vice President, Office of Diversity and Equity

Joseph Sassi
Director of Institutional Case Management, Office of Diversity and Equity

Date: December 10, 2010

RE: ODE Investigation File # 11-016 UCHC

1

## **Findings and Recommendations**

### I.     **Introduction**

The Complainant in this matter, Milna Rosario (hereinafter "Complainant"), is a Clinical Social Worker with the Correctional Managed Health Care program, assigned to the MacDougall Correctional Institution.  On September 19, 2010, Complainant filed an internal complainant with the Office of Diversity and Equity alleging that Gregory Downey (hereinafter "Respondent") engaged in sexual harassment and the creation of a hostile work environment. *Exhibit A*.

The University of Connecticut's Office of Diversity and Equity ("ODE") is a neutral investigative unit of the institution which, pursuant to state statute (C.G.S. § 46a-68(b)(4)(A)), is responsible for mitigating any discriminatory conduct within the agency and investigating all complaints of discrimination made against it. Accordingly, upon receipt of the instant complaint ODE initiated an investigation into it.  This memorandum summarizes the allegations, factual background, and findings and recommendations of ODE arising from the discrimination complaint filed by the Complainant.

### II.     **ODE's Protocol**

1. On September 8, 2009, the undersigned investigator interviewed Complainant at the MacDougall Correctional Institution.  At the interview, Complainant was given a Discrimination and Discriminatory Harassment Complaint Form.

2. On September 8, 2010, the undersigned investigator interviewed Sara Cyr, Clinical Social Worker Associate, at the MacDougall Correctional Institution.

3. On September 9, 2010, the undersigned investigator consulted with Jessica Hajdasz, Labor Relations Specialist, regarding Complainant's request to have Respondent put out on administrative leave.  Labor Relations determined that the allegation did not warrant such a placement of Respondent on administrative leave.

4. On September 10, 2010, ODE sent Respondent a letter, notifying him that he had been identified as a respondent in an internal ODE investigation. *Exhibit B.*

5. On September 16, 2010, Rikel Lightner, Health Services Administrator at MacDougall Correctional Institution, faxed ODE incident reports related to Complainant's allegation. *Exhibit C.*

6. On September 19, 2010, Complainant filed an internal complaint with the Office of Diversity and Equity alleging that Gregory Downey (hereinafter "Respondent") engaged in sexual harassment and the creation of a hostile work environment. *Exhibit A.*

7. On October 7, 2010, Attorney Andrew Houlding wrote to ODE to inform that he was representing Complainant, requesting to be informed of the outcome of the investigation, and expressing Ms. Rosario's concern of retaliation from Respondent. *Exhibit D.*

8. On October 8, 2010, the undersigned investigator interviewed Respondent at the MacDougall Correctional Institution. Prior to beginning the interview, the undersigned investigator handed Respondent the University of Connecticut non retaliation policy, and verbally cautioned Respondent to avoid any contact with Complainant, other than what was necessary in the performance of his job.

9. On October 14, 2010, ODE emailed Rikel Lightner, Health Services Administrator at the MacDougall Correctional Institution, informing her of Complainant's concerns of retaliation, and asking that she contact ODE if she becomes aware of any information regarding this. *Exhibit E.*

## III.    Summary of Interviews

### A. Complainant: Milna Rosario

Complainant was interviewed by the undersigned investigator on September 8, 2010 at the MacDougall Correctional Institution. At the outset of the interview, Complainant was advised of ODE's protocols and procedures and was provided with an explanation of ODE's investigative processes and was notified of the customary disclosures. These disclosures and notifications, including external reporting options, are mandatory and are not reflective of ODE's support for Complainant's claims. Complainant agreed to participate in the interview and then answered the investigator's questions.

Complainant advised that she and Respondent are both assigned to the second shift. She added that she feels that the incident that she reported to ODE has negatively affected the dynamic of their working relationship. Complainant explained that she feels that she can continue to do her job as a professional, and does not have a fear of Respondent.

Complainant advised that she has been employed as a Clinical Social Worker with the Correctional Managed Health Care program since March of 2005. She added that she was originally assigned to Northern Correctional Institution and then on January 29, 2010, transferred to MacDougall.

Complainant advised that she has a professional relationship with Respondent and has had no prior issues with him. Complainant explained that on September 5, 2010, just after 10:00 p.m., she was in the back of the officer's mess hall when Respondent entered the area and sat behind her. Complainant added that there were some officers in the front of the room, however they were not close enough to hear. Complainant stated that the television was on and a program came on featuring Attorney General Richard

3

Blumenthal's efforts to remove erotic ads from Craig's List. Complainant stated that at that point, Respondent said to her "There goes your part time job."

Complainant advised that she usually wears a nurse's smock when she is working, and was wearing one at the time that Respondent allegedly made the comment. She explained that the chair that she was sitting in did not have sides to it and she felt movement to the left side of her smock. Complainant stated that she did not look down, and that the movement only lasted for a few seconds. Complainant said that she was not sure if it was Respondent's hand or foot that moved her smock. Complainant stated that Respondent then got up and left. She added that she then got up, turned off the television, and went back to her office to lock it up, and then went to the medical unit, just to get out of the area.

Complainant advised that she and Respondent worked together again on the following Sunday, but she stayed in her office with the door shut and had very little interaction with him. She added that the next Monday she worked with Sara Cyr and told Ms. Cyr about the comment that Respondent made, but did not mention the issue regarding the brushing of her smock.

### B. Respondent: Gregory Downey

Respondent was interviewed by the undersigned investigator on October 10, 2010 at the MacDougall Correctional Institution. Respondent was accompanied by his union representative, Marva Malone-Lyles. At the outset of the interview, ODE explained to Respondent the nature and purpose of its inquiry. Respondent was given the customary disclosures and was informed that as a named Respondent, he would be entitled to a copy of the findings. Respondent was advised that there would be no guarantee of confidentiality, that what he shared with ODE would be reflected in its findings and recommendations. Respondent indicated that he understood these disclosures, and that he wished to proceed with the interview. Respondent was given a copy of the University of Connecticut non retaliation policy, and was verbally cautioned to avoid any contact with Complainant, other than what is necessary in the performance of his job.

Respondent advised that he has been employed with the Correctional Managed Health Care program since its inception in 1997, and is a Licensed Professional Counselor. He added that he has a professional relationship with Complainant, and works with her on the second shift.

Respondent advised that he is occasionally in the mess hall, but did not recall being there on any specific day. Respondent added that Complainant is also sometimes in the mess hall. Respondent stated that he did not recall pulling up a chair and sitting down with Complainant. He added that when he is in the mess hall he usually watches sports and does not recall a story about Richard Blumenthal and Craig's List. Respondent denied saying, "There goes your part time job," or anything close to that.

Respondent advised that he could not think of any reason why Complainant would make the allegation against him. He added that the two do not have much contact at all, and could not recall making any type of comment even related to the allegation.

4

Respondent advised that he always tells jokes but would never want to hurt anyone's feelings.

### C. Sara Cyr

Sara Cyr was interviewed by the undersigned investigator on, September 8, 2010 at the MacDougall Correctional Institution. At the outset of the interview, Ms. Cyr was advised of ODE's protocols and procedures and was provided with an explanation of ODE's investigative processes. In addition, Ms. Cyr was notified of the customary disclosures. Ms. Cyr agreed to participate in the interview.

Ms. Cyr advised that she has been employed with Correctional Managed Health Care for six years. Within that time, she has worked at both the Willard and MacDougall facilities. Complainant stated that as a CSWA she supervises both Complainant and Respondent. Ms. Cyr stated that Complainant is extremely professional and that it is unlike her to complain about anything. Ms. Cyr said that on Labor Day Monday, Complainant said to her, "I'm so mad at Gregory. You know that Blumenthal issue over Craig's List, the adult site? Well Greg said, 'Well I guess you are out of a part time job'." Ms. Cyr stated that she asked Complainant if she wanted to file a complaint, but also informed Complainant that she (Ms. Cyr) would have to report the incident.

### IV.    Facts not in Dispute

1.  Complainant is a Clinical Social Worker Associate assigned to CMHC/MacDougall-Walker. *Exhibit F.*

2.  Respondent is a Professional Counselor assigned to CMHC/MacDougall-Walker. *Exhibit G.*

3.  Both Complainant and Respondent occasionally spend time during breaks in the officer's mess hall at the MacDougall Correctional Institution.

4.  There is a television in the officer's mess hall at the MacDougall Correctional Institution.

5.  Complainant does not have discipline on file.

6.  Respondent was the subject of an ODE investigation that was concluded on September 2, 2010, and in which he was found to have engaged in behavior in violation of Department of Correction, Administrative Directive 2.1., which prohibits the "*use of racially derogatory words, phrases, epithets;*".

### V.    Applicable Standard of Review

In the present case, Complainant alleges that she was subjected to unlawful sex-based discrimination, in the form of sexual harassment, and alleges that Respondent's actions as

outlined herein are violative of internal University/Department of Correction policy which prohibits the same.

## A.  UCHC Policies

### 1.)  Policy Prohibiting Sexual Harassment

The UCHC has a policy prohibiting sexual harassment. It provides, in pertinent part, that:

*The University of Connecticut Health Center is committed to maintaining a workplace, learning environment and clinical treatment center free of sexual harassment. The University of Connecticut Health Center prohibits sexual harassment of any person or persons who conduct business with and/or perform other services on behalf of the Health Center including but not limited to: employees, faculty, resident, students, volunteers, outside vendors and contractors. This policy explains this prohibition. The University of Connecticut Health Center also complies with all applicable statutes relating to discrimination due to sexual harassment. The implementation of this policy requires the full compliance and cooperation of all employees, faculty, residents, students, volunteers, outside vendors and contractors in adherence to its principles. Sexual harassment may involve the behavior of a person of either sex relative to a person of the opposite or same sex, and occurs when such behavior constitutes unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal or physical behavior of a sexual nature where:*

- *Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's education, employment or eligibility for clinical treatment or other Health Center services;*

- *Submission to or rejection of such conduct by an individual is used as the basis for academic or employment decisions, or any other decisions affecting the individual's ability to work, study, receive clinical treatment and/or perform other services on behalf of the Health Center;*

- *Such conduct has the purpose or effect of substantially interfering with an individual's ability to work, study, receive clinical treatment and/or perform other services on behalf of the Health Center, academic or work performance, or creates an intimidating, hostile, offensive learning, working or clinical treatment environment.*

*Sexual harassment can encompass a wide range of inappropriate behavior, including, but not limited to: sexual remarks or innuendo, suggestive comments, sexually oriented remarks or jokes, physical contact or explicit sexual propositions.*

6

UCHC Policy Number 2002-48 (Revised January 29, 2008).

### 2). Affirmative Action, Non-Discrimination, and Equal Opportunity Policy

The UCHC's Affirmative Action, Non-Discrimination and Equal Opportunity Policy provides, in pertinent part that:

*The University of Connecticut Health Center reaffirms its commitment to ensuring Non-Discrimination and Equal Opportunity in all conditions of employment, as well as in its educational programs and patient services. Discrimination or harassment based on race, color, ethnicity, religious creed, age, sex (including pregnancy), sexual orientation, marital status, veteran status, national origin, ancestry, mental retardation, physical disability, including blindness, past or present history of mental disability, learning disability, criminal record, or genetic information is prohibited. Factors, which cannot lawfully be the basis for employment and academic decisions, or administering health care, are strictly prohibited. In accordance with all applicable state and federal laws, the Health Center also develops and implements Affirmative Action programs which are undertaken with conviction and effort. The Health Center has established Equal Employment Opportunity and Affirmative Action as immediate and necessary agency objectives because the institution is committed to their concepts, principles and goals. In addition, the Health Center is strongly committed to the effective, productive management of diversity within the institution. This policy applies to all employees, students, volunteers, patients, as well as, outside vendors and contractors.*

#### *EQUAL EMPLOYMENT OPPORTUNITY POLICY*

*This policy ensures that individuals are not excluded from participation, advancement, or other privileges of employment due to race, color, ethnicity, religious creed, age, sex(including pregnancy), sexual orientation, marital status, veteran status, national origin, ancestry, mental retardation, physical disability, including blindness, past or present history of mental disability, learning disability, criminal record, genetic information or other factors which cannot lawfully be the basis for employment actions, unless otherwise proposed by law. Equal Employment Opportunity is the purpose and goal of Affirmative Action under Sections 46a-68-31 through 46a-68-74 of the Connecticut*

*Statutes, and of applicable federal legislation. Equal Employment Opportunity also provides for an employment system in which neither intentional nor unintentional discrimination is present. These non-discrimination laws also prohibit any workplace harassment on the basis of protected group identity.*

\*       \*       \*

7

> *Violations of this policy may result in disciplinary action, which may*
> *include, but is not limited to, written warning, demotion, transfer,*
> *suspension, expulsion, or dismissal.*

## B.   Applicable DOC Policy

### 1.) General Prohibition

Similar to the above-cited UCHC policy, internal DOC policy also prohibits
sexual harassment. Specifically, the Department of Correction's Administrative
Directive 2.2 "AD 2.2"), provides, in pertinent part, that "it is the policy of the
Department of Correction to provide its employees with a workplace free of sexual
harassment, retaliation and related misconduct." *State of Connecticut Department of
Correction, Administrative Directive 2.2 "Sexual Harassment", September 15, 2008, §*
(attached hereto as "*Exhibit H*" ). AD 2.2 states that "some" of its provisions "are
intentionally broader than the prohibitions against sexual harassment provided under state
and federal law." *Id.* AD 2.2 applies to CMHC employees working at DOC facilities.
*Id., § 4(B),(D).*

### 2.) Sexual Harassment Defined

AD 2.2 specifically defines the term "sexual harassment as:

> *"any unwelcome sexual advance, request for sexual favors,*
> *disparagement or hazing on the basis of gender, gender identity or sexual*
> *orientation, or conduct, verbal or physical, that is of a sexual nature or*
> *that is addressed to sexual attributes when:*

> *1. submission to such conduct is made, either explicitly or implicitly, a*
>    *term or condition of an individual's employment;*

> *2. submission to, or rejection of, such conduct by an individual is used*
>    *as the basis for employment decisions affecting the individual;*

> *3. such conduct has the purpose or effect of creating an intimidating,*
>    *hostile or offensive working environment; or,*

> *4. such conduct substantially and adversely affects the working*
>    *conditions of an employee or person providing services as a vendor,*
>    *volunteer or contractor or the privileges of any non-inmate at a*
>    *Department facility.*

*Id., § 3(C).*

3.) General Principles of AD 2.2

Articulating its general principles, AD 2.2 provides, *inter alia*, that "[s]exual harassment is a form of misconduct that undermines the integrity of the employment relationship and the professionalism and efficiency of the Department." *Id., § 4(A)*. It provides further, however, that the policy "does not prohibit normal, courteous, respectful, pleasant and non-coercive interactions." *Id., § 4(E)*.

AD 2.2 states that "[i]dentification of conduct, verbal or physical, as sexual harassment does not depend on the intention or motivation of the actor but on whether such conduct meets the definition of sexual harassment and/or could reasonably be perceived as sexual harassment by the person experiencing it." *Id., § 4(F)*. It further states that "[c]onduct need not be repeated, severe or pervasive to constitute a violation of this Directive." *Id., § 4(G)*.

4.) AD 2.2's List of "Examples of Sexual Harassment"

The policy provides that "any conduct that constitutes sexual harassment as defined in Section 3 of this Directive is prohibited." *Id., § 5*. It then goes on to identify a list of behaviors which are "examples of sexual harassment that violates this policy." *Id.* They are:

*A. Sexual flirtation or touching;*

*B. Advances or propositions after an indication that such are unwelcome;*

*C. Verbal conduct of a sexual nature;*

*D. Graphic or sexually suggestive comment about an individual's dress, body, sexual attributes, sexual activities, gender identity, or sexual orientation;*

*E. Use of sexually degrading words to describe an individual;*

*F. Display in the workplace of sexually suggestive objects, pictures, or photographs;*

*G. Making a comment or starting or spreading a rumor that has the effect of embarrassing, ridiculing, or demeaning an individual on the basis of his or her sexual attributes, gender identity, or sexual orientation;*

*H. Making a decision concerning an employee's terms or conditions of employment on the basis of an employee's refusal to submit to sexual advances or any kind of sexual harassment as defined herein or threatening or insinuating that such refusal will adversely affect an employee's terms and conditions of employment in any way;*

9

*I. Making a decision concerning an employee's terms or conditions of employment or stating or insinuating that any term or condition of employment will be favorably affected by an employee's willingness or appearance of willingness to tolerate sexual advances or other sexual harassment, as defined herein;*

*J. Jokes, pranks, vandalism or banter that tend to denigrate or show hostility toward an individual or group on the basis of gender, sexual attributes, or sexual orientation;*

*K. Sexual assault;*

*L. Exposing one's genitals, buttocks or breasts; or,*

*M. Unnecessary touching or physical interference with the movements of another person.*

*Id.*

### 5.) Complaint Process Under AD 2.2

AD 2.2 prescribes the process under which complaints involving claims of sexual harassment are to be administered. It provides, in pertinent part, that a "complaint of sexual harassment, retaliation or related misconduct shall be made within sixty (60) days of the conduct complained of; however, the Equal Employment Opportunity Director has discretion to accept and investigate complaints made after sixty (60) days and shall do so for good cause shown. The Equal Employment Opportunity Director shall accept and investigate such complaints without a showing of good cause for delay if they allege ongoing or continuous misconduct that has continued by the same alleged wrongdoer(s) within the sixty-day period." *Id, § 10.* AD 2.2 further provides that the "Affirmative Action Unit shall conduct and complete a fair, objective, comprehensive, and, to the extent possible, confidential investigation into each and every complaint of sexual harassment, retaliation or related misconduct." *Id., §10(C).*

### 6.) Remedies

According to AD 2.2, "any employee, manager or supervisor who is found, after investigation, to have (a) engaged in conduct prohibited by this Directive; (b) failed to cooperate fully and truthfully in an investigation; or (c) to have lied or given false testimony during the course of an investigation shall be subject to consequences appropriate to the violation, including discipline up to and including dismissal." *Id, § 11.* The Directive provides further that "[u]pon a recommendation from the Equal Employment Opportunity Director or the Commissioner's own determination, the Commissioner may order appropriate measures to remedy conditions that violate this Directive." *Id., § 12.* It states that "[s]uch remedial measures may include steps necessary to protect Complainant, other employees, and supportive witnesses from

harassment or retaliation during and after the investigation, including but not limited: to counseling the alleged harasser to refrain from conduct that may be, or perceived to be harassing or retaliatory; transferring or placing on administrative leave the alleged harasser; or offering Complainant, where available an administrative transfer to another facility or location." *Id, § 12.*

## C. Legal Framework for Review

The above policies are considered to provide the same and with respect to certain provisions of AD 2.2, more protection against discrimination afforded under the Connecticut Fair Employment Practices Act (CFEPA) and/or Title VII of the Civil Rights Act of 1964 (Title VII). Analysis of a discrimination claim under the *Affirmative Action and Equal Employment Opportunity and Harassment* policies and/or *The University of Connecticut's Discrimination Complaint Procedures* thus mirrors the analysis of a claim under the CFEPA and/or Title VII. Further, analysis of a discrimination claim under the CFEPA follows the analysis under Title VII. *See*, e.g., *Perodeau* v. *City of Hartford*, 259 Conn. 729, 738 (2002); *Levy* v. *Comm'n of Human Rights & Opportunities*, 236 Conn. 96, 108 (1996)(noting that the same legal standard applies to claims brought under the CFEPA and Title VII).

### 1.) Title VII - Hostile Work Environment (Sexual Harassment)

To prevail in a hostile work environment case, the totality of the circumstances must point to a sexually objectionable environment that was both objectively and subjectively offensive, such that a reasonable person would find the environment hostile or abusive, and one that the victim in fact did perceive to be so. *Harris* v. *Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). A complainant is not required to reject the advances of a supervisor and suffer his or her wrath in order to be protected under Title VII. *Harris* v. *Forklift Systems*, supra, 510 at 23. The Supreme Court has held that "the gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome." *Meritor Savings Bank* v. *Vinson*, 477 U.S. 57, 68, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). In many cases, "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Id.* Furthermore, unwelcome advances and expressing that these advances were unwelcome depends on the power to say no. A key element of any hostile work environment claim contains both objective and subjective components, namely that "the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. . . ." (Citation omitted.) *Id.*, 221. In assessing the objective hostility of a work environment, the Court focuses on:

> *"the totality of the circumstances. . . . Further, the perspective from which the evidence must be assessed is that of a reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target. . . ."*

(Internal quotation marks and citations omitted.) *Id.* Factors that are relevant in determining whether a reasonable person would find conduct hostile are the frequency of the conduct, its severity, whether it is "physically threatening or humiliating, or a mere offensive utterance," and whether it interferes with the employee's work performance. *Harris* v *Systems, Inc.*, supra, 510 U.S. at 17.

## VI.   Application of Facts to Standard of Review

### A) Issue Presented

The narrow issue presented is whether the conduct attributed to Respondent by Complainant constitutes "sexual harassment" as is defined and as is prohibited under DOC Administrative Directive 2.2. In recognition of AD 2.2's express admonition that "some" of its provisions "are intentionally broader than the prohibitions against sexual harassment provided under state and federal law" (*AD 2.2, § 1*), analysis of the issue will be limited to determining whether any proven conduct of Respondent's meets the lower definitional thresholds set forth AD 2.2. Where appropriate, however, and as will be noted *infra*, the instant analysis shall be informed by governing legal principles and authority to the extent reliance upon such legal authority is not inconsistent with the strictures of AD 2.2.

As noted above, AD 2.2 defines "sexual harassment", as "any unwelcome sexual advance, request for sexual favors, disparagement or hazing on the basis of gender, gender identity or sexual orientation, or conduct, verbal or physical, that is of a sexual nature or that is addressed to sexual attributes when: (1) submission to such conduct is made, either explicitly or implicitly, a term or condition of an individual's employment; (2) submission to, or rejection of, such conduct by an individual is used as the basis for employment decisions affecting the individual; (3) such conduct has the purpose or effect of creating an intimidating, hostile or offensive working environment; or, (4) such conduct substantially and adversely affects the working conditions of an employee or person providing services as a vendor, volunteer or contractor or the privileges of any non-inmate at a Department facility". *Id., § 3(C).* A careful and generous scouring of the complaint does not reveal that Complainant is alleging that Respondent made unwelcome sexual advances, requests for sexual favors or that he engaged in *quid pro quo* sexual harassment as contemplated by AD 2.2's definition. Rather, the gravamen of her complaint is that Respondent made one unwelcome comment of a sexual nature to which she took offense. Specifically, Complainant alleges Respondent made the comment to her, "There goes your part time job," (in reference to a news story about Attorney General Richard Blumenthal's efforts to remove erotic ads from Craig's List). For his part, Respondent denied the allegation made by Complainant. Thus, the question is whether the alleged verbal conduct of Respondent constitutes an AD 2.2 violation.

In situations such as this, where the facts are in dispute, resolution of claims often depends on credibility assessments.

12

## A. Factors to Consider in Resolving Issues of Credibility

Resolution of sexual harassment claims often depends on credibility assessments and the gathering of corroborative evidence. Under the circumstances presented here, the parties' contradictory assertions require a credibility assessment. Factors that are routinely used to assess a party or witness' credibility include, but are not necessarily limited to: (1) the witness opportunity and capacity to observe the event or act in question; (2) the witness character; (3) any prior inconsistent statement by the witness; (4) a witness bias, or lack of bias; (5) the contradiction of the witness version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness version of events; and (7) the witness demeanor. *See, e.g., Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987).

The EEOC further recognizes the difficulties inherent in evaluating evidence in case involving allegations of sexual harassment to which there are no third party witnesses:

*The Commission recognizes that sexual conduct may be private and unacknowledged, with no eyewitnesses. Even sexual conduct that occurs openly in the workplace may appear to be consensual. Thus the resolution of a sexual harassment claim often depends on the credibility of the parties. The investigator should question the charging party and the alleged harasser in detail. The Commission's investigation also should search thoroughly for corroborative evidence of any nature. Supervisory and managerial employees, as well as co-workers, should be asked about their knowledge of the alleged harassment.*

*In appropriate cases, the Commission may make a finding of harassment based solely on the credibility of the victim's allegation. As with any other charge of discrimination, a victim's account must be sufficiently detailed and internally consistent so as to be plausible, and lack of corroborative evidence where such evidence logically should exist would undermine the allegation. By the same token, a general denial by the alleged harasser will carry little weight when it is contradicted by other evidence.*

*Of course, the Commission recognizes that a charging party may not be able to identify witnesses to the alleged conduct itself. But testimony may be obtained from persons who observed the charging party's demeanor immediately after an alleged incident of harassment. Persons with whom she discussed the incident - - such as co-workers, a doctor or a counselor - - should be interviewed. Other employees should be asked if they noticed changes in charging party's behavior at work or in the alleged harasser's treatment of charging party. As stated earlier, a contemporaneous complaint by the victim would be persuasive evidence both that the conduct occurred and that it was unwelcome. So too is evidence that other employees were sexually harassed by the same person.*

13

*However, when the credibility of the parties is at issue, the charging party's claim will be considerably strengthened if she made a contemporaneous complaint or protest.*

*EEOC Policy Guidance on Current Issues of Sexual Harassment.* March 19, 1990 (Number N-915-050); *see also Henson v. City of Dundee,* 682 F.2d, 897, 912 at n.25 (11th Cir. 1982)("In a case of alleged sexual harassment which involves close questions of credibility and subjective interpretation, the existence of corroborative evidence or the lack thereof is likely to be crucial.").

Similarly, in its *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors,* the Equal Employment Opportunity Commission ("EEOC") offers the following suggestions for employers faced with resolving issues of fact by means of credibility assessments:

*If there are conflicting versions of relevant events, the employer will have to weigh each party's credibility. Credibility assessments can be critical in determining whether the alleged harassment in fact occurred. Factors to consider include:*

- *Inherent plausibility: Is the testimony believable on its face? Does it make sense?*
- *Demeanor: Did the person seem to be telling the truth or lying?*
- *Motive to falsify: Did the person have a reason to lie?*
- *Corroboration: Is there witness testimony (such as testimony by eye-witnesses, people who saw the person soon after the alleged incidents, or people who discussed the incidents with him or her at around the time that they occurred) or physical evidence (such as written documentation) that corroborates the party's testimony?*
- *Past record: Did the alleged harasser have a history of similar behavior in the past?*

None of the above factors are determinative as to credibility. For example, the fact that there are no eye-witnesses to the alleged harassment by no means necessarily defeats the complainant's credibility, since harassment often occurs behind closed doors. Furthermore, the fact that the alleged harasser engaged in similar behavior in the past does not necessarily mean that he or she did so again.

*EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 18, 1999)(No. 915.002) at Chapter V, Section C(1)(e)(ii); *see also EEOC Policy Guidance on Current Issues of Sexual Harassment.* March 19, 1990 (Number N-915-050); *see also Henson v. City of Dundee,* 682 F.2d, 897, 912 at n.25 (11th Cir. 1982)("In a case of alleged sexual harassment which involves close questions of credibility and subjective interpretation, the existence of corroborative evidence or the lack thereof is likely to be crucial.").

## VII.   Credibility Analysis

With these principles in mind, ODE shall attempt to analyze Complainant and Respondent's differing accounts in order to determine whether one's version of events is more likely to have occurred than the other's. As highlighted above, ODE interviewed Complainant, Respondent, and the supervisor of both employees, in an effort to resolve the factual issues presented.   Complainant alleges that on September 5, 2010, Respondent said to her, "There goes your part time job," (in reference to a news story about Attorney General Richard Blumenthal's efforts to remove erotic ads from Craig's List). For his part, Respondent denies the allegation categorically. No third-party witnesses were identified to support either version, and as such, a credibility assessment is required. In assessing the credibility of the parties to this factual dispute, several considerations are in order.

First, the investigative record has not uncovered any basis upon which to conclude that Complainant had an incentive to fabricate these allegations or that she had any discernable motive for lodging them. Likewise, there is no basis in this investigative record to conclude that Complainant has ever pressed false allegations in the past.[1] Similarly, when Respondent was asked whether he was aware of any reason why Complainant would lodge such a complaint, he advised that he could not think of any reason that Complainant would make the allegation against him, adding that added that the two do not have much contact at all. Ms. Cyr, the supervisor of both employees, described Complainant as being extremely professional and that it is unlike her to complain about anything.

Furthermore, as noted above, the fact that there are no eyewitnesses to the alleged harassment does not necessarily defeat or undermine Complainant's credibility. Under appropriate circumstances, as is evident here, findings of harassment may be based solely on the credibility of the victim's allegation, but as with any other charge of discrimination, "a victim's account must be sufficiently detailed and internally consistent so as to be plausible." *EEOC Policy Guidance on Current Issues of Sexual Harassment, supra.* As explained above, Complainant's version of the alleged incident is undeniably detailed and specific. Furthermore, Complainant made a contemporaneous complaint of the incident and provided details of the date and verbal and physical interactions between her and Respondent. In so reporting, Complainant provided a detailed account of the allegation that included dates, places and approximate times that the comment occurred. In addition, Complainant informed her supervisor of the incident in a timely manner, and an examination of her reports to her supervisor and to ODE reveal that they are internally consistent.   Juxtaposing these considerations with Respondent's blanket denial of the specific allegation (but with his admission that he "always tells jokes"), and taking into account any lack of interest, bias or motive on the part of Complainant, the evidence

---

[1] As noted above, however, Respondent has been found to have violated DOC's non-discrimination policy in September 2010, for making an inappropriate verbal comment of a racial nature.

15

supports a finding that, more likely than not, Respondent made the remark as alleged by Complainant.

As noted above, the instant analysis is informed by AD 2.2's affirmation that some of its provisions are intentionally broader than the prohibitions against sexual harassment provided under state and federal law. While a one-time comment of the kind at issue here would under most circumstances not, as a legal matter, be sufficiently severe and/or pervasive to rise to a level such that it would constitute a "hostile work environment" under Title VII or its state law counterpart's jurisprudence (*see, e.g., Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)(holding that "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious)" will not amount to discriminatory changes in the "terms and conditions of employment")(internal citations and quotations omitted)), AD 2.2 expressly provides that "[c]onduct need not be repeated, severe or pervasive to constitute a violation of [it]." AD 2.2, §4(G). Constraining the instant analysis to the letter of AD 2.2, ODE finds that Respondent's undoubtedly constitutes a violation of the Directive. Among the specific examples of conduct which AD 2.2 identifies as being violative of its terms are "verbal conduct of a sexual nature" and "[j]okes, pranks, vandalism or banter that tend to denigrate or show hostility toward an individual or group on the basis of gender, sexual attributes, or sexual orientation." AD 2.2, §§5(C),(J). However mild or innocuous Respondent's intentions were in making this comment (to which he does not admit), is not only ill-advised, but also constitutes verbal conduct "of a sexual nature" which most certainly could have "the effect of creating an intimidating, hostile or offensive working environment" to those who hear it. Therefore, ODE finds that his comment constitutes "sexual harassment" as that term is defined under AD 2.2, § 3(C)(3).

## VIII.  Findings & Recommendations

ODE is a neutral investigatory unit within the University that was created by statute and charged with investigating internal discrimination complaints to determine if employee conduct violates University policies, which have been construed to provide protections aligned with current law. ODE is further charged with making findings and recommendations designed to mitigate the harm caused by discriminatory conduct, and prevent recurrence of discriminatory conduct. Accordingly, ODE's investigative reports include findings based on application of current legal and regulatory standards of review.

After a careful review of the written complaint filed by Complainant and evidence provided by Respondent to the ODE investigator, ODE concludes that, the totality of the circumstances, support a finding that Respondent violated the Department of Correction Administrative Directive 2.2 as alleged. As a result, ODE recommends as a measure intended to mitigate the harm caused by the proven misconduct of Respondent and prevent its recurrence that UCHC Labor Relations, to the extent practicable and consistent with the requirements of any applicable collective bargaining agreement, take appropriate action which will impress upon Respondent the seriousness of his actions.

Respectfully submitted,

Robert Camilleri
EEO Specialist

17

## **APPEAL RIGHTS**

If you are dissatisfied with the Office of Diversity and Equity's (ODE's) final decision, you may request that ODE's decision and recommendations be reviewed by submitting a written request to the President of the University, in care of the ODE Director. The request should identify the grounds for the appeal, which are limited to, (a) violations of complaint procedures; and (b) additional evidence which was not available during the investigation.

Requests for review must be received by ODE within fourteen (14) calendar days from receipt of the notice of findings. Those received beyond that period will be considered at the discretion of the ODE Director. For timeliness purposes, it will be presumed that this transmittal was received within five (5) calendar days after it was mailed.

Complainants may also file a complaint with state and federal rights civil enforcement agencies, generally with in 180 calendar days from the date of the alleged discriminatory event.

Please see the University of Connecticut's Discrimination Complaint Procedures for further guidance.

Date:  December 10, 2010

Robert Camilleri
EEO Specialist
Office of Diversity & Equity

18